AUSA: Corinne Lambert Telephone: (313) 226-9129

AO 91 (Rev. 11/11) Criminal Complaint Special Agent: Sandra Reynolds Telephone: (313) 590-4374

# UNITED STATES DISTRICT COURT

for the

Eastern District of Michigan

United States of America
v.
Darlette Williams

Case No. 26−mj−30575

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of September 2019 - August 2022 in the county of Jackson County in the Eastern District of Michigan, the defendant(s) violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| 42 U.S.C. § 1383a(a)(4) | Social Security Representative Payee Fraud |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

Complainant's signature

Sandra Reynolds, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence and/or by reliable electronic means.

Judge's signature

Date: September 17, 2026

City and state: Detroit, Michigan

Anthony P. Patti- Magistrate Judge
*Printed name and title*

Save Print

**AFFIDAVIT IN SUPPORT OF**
**CRIMINAL COMPLAINT AND ARREST WARRANT**

I, **SANDRA REYNOLDS,** being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1) I am a Special Agent with the Social Security Administration, Office of the Inspector General, Office of Investigations (SSA/OIG/OI) and have been so employed since March 2020. I hold a Bachelor of Science degree in Criminology from Florida State University, and a Master of Business Administration from Lynn University. I am a graduate of the United States Army Criminal Investigation Division (CID) Special Agent Course, having successfully completed the 15-week CID Special Agent Course. Additionally, I completed the Inspector General Investigator Training Program through the Council of the Inspector General on Integrity and Efficiency. My current job duties include conducting investigations of violations of Social Security laws and related statutes, including but not limited to Title 42 U.S.C. § 1383a(a)(4) (Social Security Representative Payee Fraud). I am authorized to execute warrants and make arrests.

2) I have been assigned to an investigation concerning the disposition of Social Security benefits issued to Darlette WILLIAMS (hereinafter WILLIAMS),

who was serving in the capacity of representative payee for a minor SSA beneficiary, V.W.

3) Based on my investigation thus far, there is probable cause to believe that WILLIAMS, V.W.'s representative payee and aunt, converted the SSA benefits intended for V.W. to her own use, in violation of Title 42 U.S.C. § 1383a(a)(4) (Social Security Representative Payee Fraud).

4) I have prepared this affidavit in support of a criminal complaint and arrest warrant for WILLIAMS. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is presented for the limited purpose of showing there is sufficient probable cause for the requested complaint and warrant and does not set forth all of my knowledge about this matter.

## INVESTIGATION SUMMARY

5) WILLIAMS received monthly SSA benefits on behalf of V.W. from September 2019 through August 2022. As V.W.'s representative payee, WILLIAMS was required to use V.W.'s benefits for his needs, care, and in his best interest. In April 2022, the SSA office in Jackson, Michigan completed a Continuing Disability Review (CDR) over the phone with

WILLIAMS and a male whom they thought was V.W. A couple of days after the telephonic CDR, V.W. went into the same SSA office to request a replacement social security number (SSN) card. The SSA employee who completed the CDR met V.W. in person and referenced the telephonic CDR. V.W. responded with complete surprise, told the employee he never spoke with anyone from the SSA office, that he wasn't disabled, and had no idea that he was on Social Security benefits. The investigation indicated that V.W. had been living with and fully supported by a friend's family since 2017 and only received cash a couple times from WILLIAMS, totaling less than $1,000.00. WILLIAMS asserted that she used all of V.W.'s SSA benefits for V.W.'s needs. However, bank records reflect that WILLIAMS accessed V.W.'s benefits by making cash withdrawals and purchases at various merchants, many of which were unrelated to V.W.'s care and needs. The SSA determined that WILLIAMS misused $46,844.00 of V.W.'s benefits.

## **PROBABLE CAUSE**

### **Social Security Program Background**

6) The SSA administers the Supplemental Security Income (SSI) program under Title XVI of the Social Security Act. The SSI program is designed to

provide a floor of income for the aged, blind, or disabled who have little or no income and resources. The amount of the SSI check depends on how much other income an individual receives, living arrangements, and other circumstances that affect an individual's financial needs. Disabled beneficiaries are reviewed periodically by the SSA to determine whether improvement in their medical condition and/or any work activity affects continuing entitlement.

7) If it is determined that an SSA beneficiary is incapable of handling their own finances, the SSA will select a "representative payee" to assist with the management of SSA funds. The SSA deems minor children to be incapable of handling their own finances. As part of the representative payee application process, the applicant agrees to use the benefits for the care and needs of the beneficiary, is notified of the need to notify the SSA if a child beneficiary leaves his care, and is responsible for accounting for how the benefits were allocated. If the SSA learns that the representative payee is not using the money for the beneficiary's needs, it will stop sending money to the representative payee. If the representative payee did not use the benefits for the beneficiary as required, the SSA considers the benefits to have been "misused."

**Darlette WILLIAMS Investigation**

8) According to SSA records, V.W. became entitled to Social Security SSI benefits in 2012, at the age of 8, based on a disabling psychological disorder. V.W. required a representative payee due to his age.

9) In September 2018, WILLIAMS applied to be V.W.'s representative payee. WILLIAMS is V.W.'s aunt. As part of the application process, WILLIAMS affirmed that she would notify the SSA when V.W. left her custody or otherwise changed his living arrangements and that she would use the benefits for V.W.'s needs. WILLIAMS's application was approved, and she began receiving V.W.'s SSA payments in September 2019.

10) From 2019 through 2022, WILLIAMS completed multiple representative payee accounting forms to document how V.W.'s benefits were spent. On those forms, WILLIAMS attested that V.W. continued to live with her and that she spent all of V.W.'s SSI benefits on his food, housing, and other needs.

11) In April 2022, I received an allegation from the SSA office in Jackson, MI, which asserted that WILLIAMS was the representative payee for SSI beneficiary V.W., and that WILLIAMS knowingly collected benefits for V.W. but failed to provide financial assistance to V.W. while he was in the

care of another family. The allegation described the telephonic CDR and encounter with V.W. at the Jackson SSA office previously mentioned above.

12) Following the receipt of the allegation, I conducted an in-person interview with the mother of the family V.W. was living with, C.W. I met with C.W. on July 27, 2022, at the Jackson SSA office, and C.W. provided the following written statement:

> In October of 2017 [V.W] came to live with my family. In January of 2018 his mom signed a power of attorney for us. He has lived with us ever since the time in October of 2017. Neither my husband or myself have received any money for support during this time. We have fully supported him since October 2017.

C.W. provided me with a copy of the power of attorney.

13) I also conducted an in-person interview with V.W. at the Jackson SSA office on July 27, 2022. V.W. provided the following written statement:

> I [V.W] have come here today due to the reasoning of fraud from my aunt who's lied to the government about getting disabled checks from me, I was never living with her never once in my life before always my mom. She took me here for a meeting when I was in the 8th grade for disability but due to my age I never knew what it was actually for. I was in a conference room with a lot of chairs but it was just me and my aunt and that lady/men he or she recorded my answers. She asked me a lot of basic common answers. My aunt has giving [sic] me $200 once in a blue moon. She doesn't keep in touch. Me and her have never communicated. She has never supported me a day in my life. You would think for a person

who's [sic] she's living off would at least come support me in sports.

14) I interviewed WILLIAMS in August 2022. In response to questions, WILLIAMS provided the following summarized information:

- WILLIAMS said she was the representative payee for her nephew, V.W., and her brother, and that both of them lived with her. She said that V.W. had lived with her for the past 3.5, almost 4 years. She was not sure where V.W. was at the current moment and said he was out of school and running the streets.
- WILLIAMS said an inspection guy at the Social Security office asked her to become the payee after her sister got addicted to drugs, because her sister had put her name down. WILLIAMS went to the office and brought V.W. with her when he was 16 to fill out the paperwork. WILLIAMS said V.W. was at her house after school when she took him to the office.
- WILLIAMS stated that V.W. just graduated. She said she was setting up an open house for his graduation. WILLIAMS stated she still had the lump sum for V.W., and it was being held in a bank account. [*Special Agent Note: a lump sum of $18,108.00 in previously underpaid SSI benefits had recently been issued to WILLIAMS for the*

*benefit of V.W.*] WILLIAMS stated she was saving the $18,000.00 for V.W. for when he walked across the stage so he could have something. She planned to give the money to him in an envelope at his open house. [*Special Agent Note: I received information that one week after I interviewed WILLIAMS, she gave V.W. a cashier's check for $15,000.00 at an open house.*]

- WILLIAMS said that sometimes V.W. stayed with his girlfriend. WILLIAMS said that she would sometimes give V.W. money through his girlfriend's Cash App account.
- When I told WILLIAMS that we knew V.W. had been living with another family, WILLIAMS responded that V.W. lived with his middle school basketball coach before, but she could not recall the coach's name. [*Special Agent Note: C.W.'s husband was V.W.'s 5th grade basketball coach.*] WILLIAMS said she didn't stop him from going out there [to the coach's house], because he went to school out there. WILLIAMS said that V.W. would just come to her house every now and again. WILLIAMS stated that V.W. had been living back and forth with her. WILLIAMS said that V.W. was lying if he told us he had been living with them for the whole 5 years.

- WILLIAMS said she gave V.W. money all the time. She said she bought him Christmas gifts and other items. WILLIAMS stated she paid V.W.'s cell phone bill. She explained that V.W. had a separate cell phone line through Metro PCS and that she would go into the store to pay his bill. WILLIAMS stated she bought V.W. whatever, to include books and supplies when he went to school.
- WILLIAMS said that V.W. told her that a lady called him at school and tried to get him to report WILLIAMS for fraud, but V.W. told WILLIAMS he wasn't going to get her for fraud.
- WILLIAMS said she did not care what V.W., or the family said, but she wasn't lying.

15) In the course of the investigation, I reviewed documents provided by Reed Manner (Jackson Housing Commission) pursuant to an Inspector General Subpoena for information related to WILLIAMS. The documents included lease agreements beginning on: (1) October 28, 2019; (2) October 1, 2020; and (3) October 1, 2021. None of the documents listed V.W. as a "Household Member."

16) I reviewed the records for the American 1 Credit Union account into which V.W.'s SSA benefits were deposited from October 1, 2019, through June 1, 2021. Some of the bank activity is summarized below:

Deposits into the account during this period included:

- Monthly deposits for V.W.'s SSI;
- Multiple deposits for the State of Michigan supplemental SSI for approximately $40.00 each;
- Multiple deposits of varying amounts from the Unemployment Insurance Agency (UIA) for unemployment insurance benefits starting in May 2020; and
- IRS deposits for $1,400.00 on April 7, 2021, and $2,800.00 on June 30, 2021.

Debits to the account included:

- Automated Teller Machine (ATM) withdrawals for varying amounts;
- Debit card withdrawals for streaming services, Internet and cell phone providers [none of which were the purported cellular service for V.W.'s cell phone], various food stores, and Inmate phone service; and

- Point of sale (POS) withdrawals for Amazon, a beauty supply store, and liquor stores.

17) I also reviewed the records for the Comerica Direct Express Card bank account into which V.W.'s SSA benefits were deposited for the period of July 1, 2021, through August 6, 2022. The only deposits into this account were V.W.'s SSI benefits.

Debits to the account included:

- Monthly ATM withdrawals of varying amounts;
- POS purchases for streaming services and at Internet and cell phone providers [again, none of which were the purported cellular service for V.W.'s cell phone];
- POS purchases at discount stores, a luxury purse outlet store, a car dealership, liquor stores, nail salons, and an airline for luggage;
- Recurring POS purchases on the website of a medical alarm system provider; and
- Recurring monthly purchases for AAA for approximately $12.60.

18) I provided the SSA with my investigative findings regarding WILLIAMS. The SSA determined that WILLIAMS misused $46,844.00 of V.W.'s SSA benefits from September 2019 to September 2022.

**CONCLUSION**

19) Accordingly, based upon my training, experience, and the facts set forth in this Affidavit, there is probable cause to believe that WILLIAMS, while serving in an official capacity as representative payee, unlawfully converted SSA benefits intended for V.W. to her own personal use and did thereby knowingly and intentionally violate Title 42 U.S.C. § 1383a(a)(4).

I, SANDRA REYNOLDS, Special Agent with the Social Security Administration, Office of the Inspector General, Office of Investigations, being duly sworn according to law, hereby affirm that the facts stated in the foregoing affidavit are true and accurate to the best of my knowledge, information, and belief.

SANDRA REYNOLDS
Special Agent, SSA/OIG/OI

Subscribed and sworn to before me
this 17th Day of September, 2026.

ANTHONY P. PATTI
United States Magistrate Judge